# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 24-1697V

|  |  |
|---|---|
| CHARLES JONES, <br><br>          Petitioner, <br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br>          Respondent. | Chief Special Master Corcoran <br><br> Filed: March 10, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Dima Jama Atiya, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On October 18, 2024, Charles Jones filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS"), a defined Table injury, after receiving an influenza ("flu") vaccine on October 1, 2023. Petition at 1, ¶¶ 1, 38. The matter was assigned to the "Special Processing Unit" (the "SPU"), and although Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately two months after Petitioner was determined entitled to compensation, he informed me that the parties had reached an impasse in their damages discussions and requested "that the matter be slated for further litigation." Status Report at 2, ECF at 24.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$178,000.00 for past pain and suffering.**

## I.      Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.  Prior SPU Compensation of GBS Pain and Suffering

### A.  General Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of January 1, 2026, 1,004 GBS cases have been resolved since SPU's inception ten years ago. Compensation has been awarded in the vast majority of cases (954), with the remaining 50 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[4] Agreement |
|---|---|---|---|---|
| **Total Cases** | *72* | *475* | *23* | *384* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $148,568.21 | $125,000.00 | $142,500.00 | $100,000.00 |
| **Median** | **$167,100.02** | **$165,000.00** | **$252,000.00** | **$150,000.00** |
| **3rd Quartile** | $186,457.51 | $240.831.00 | $386,685.56 | $216,030.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

---

[4] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

## B.     Adjudication of Pain and Suffering in GBS Cases

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[5]

As of January 1, 2026, on nearly every occasion that SPU has had to resolve the appropriate award for GBS-associated pain and suffering, over $100,000.00 has been awarded (with a lower sum ($92,500.00) only awarded once). The remaining sixty-one (71) awards far exceeded $100,000.00. The first-quartile value is $145,000.00. The median is $161,500.00. The third-quartile value is $175,000.00. The largest award was $225,000.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 - 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy ("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). *Id.* The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." *Id.* at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher

---

[5] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[6]

A consistent starting consideration in determining pain and suffering awards in the context of a GBS injury is that the amounts should exceed "those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[7] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v.*

---

[6] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[7] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

*Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

In addition, "[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). But a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence often *supplements* the record evidence, and/or corroborates important fact contentions.

### III.    The Parties' Arguments

Seeking compensation for past pain and suffering in the amount of $185,000.00., Petitioner characterizes his illness as severe and debilitating. Petitioner's Brief on Damages ("Brief"), filed Nov. 17, 2025, at 17, ECF No. 27. He insists that "[t]he medical records in this case paint a clear picture of [his] rapid and severe GBS onset, followed by an extensive course of treatment that has not fully restored [his] health." *Id.* He emphasizes his 17-day hospitalization - began eleven days post-vaccination and interrupted once by an unsuccessful two-day attempt at rehabilitation; 25 days of inpatient rehabilitation thereafter; continued need for a walker or cane even after returning home; at least 105 physical therapy ("PT") sessions during the subsequent year and three months; and continued symptoms such as a pins and needles feeling in his feet, balance issues, sleep loss, fatigue, back pain, lack of energy, and gastrointestinal issues. *Id.* at 17-19. To support his assertion of residual symptoms, Petitioner provided updated medical records from treatment received July 2024 through February 2025. Exs. 15-18, ECF No. 26.

Petitioner favorably compares the facts and circumstances in his case to those

experienced by the petitioners in *McCray, Johnson,* and *Fedewa*[8] – decisions involving past pain and suffering awards of $180,000.00. Brief at 20-22. Noting shared similarities with the *McCray* petitioner – specifically the duration of the hospital stays and inpatient rehabilitation - Petitioner argues that his award should be slightly greater because he required 30 PT sessions during the two, post-hospitalization months when he could ambulate unassisted. *Id.* at 20. Regarding *Johnson* and *Fedewa,* Petitioner emphasizes the longer duration of his hospital and inpatient rehabilitation and more extensive treatment. *Id.* at 21. And he equates his receipt of a clear diagnosis only after seeking treatment three times with the difficulties the *Fedewa* petitioner experienced obtaining his GBS diagnosis.

Characterizing Petitioner's GBS illness as moderate, Respondent counters that $148,000.00 is an appropriate amount for Petitioner's past pain and suffering. Respondent's Brief on Damages ("Opp."), filed Nov. 17, 2025, at 1, 5. To support his assertion that "[t]he overall sequela of [P]etitioner's GBS was nine months," Respondent cites Petitioner's report that he was able to do some cross country skiing four months post-vaccination in February 2024, was hiking and had stopped taking Gabapentin six months post-vaccination in April 2024, and was doing well at his last neurology appointment seven months post-vaccination in May 2024.

As comparable cases, Respondent proposes *Castellanos* and *Schenck*[9] -involving past pain and suffering awards of $125,000.00 and $150,000.00, respectively. Opp. at 6-7. Respondent contends, however, that Petitioner's award should be slightly less than $150,000.00 because the *Schenck* petitioner experienced personal difficulties (not present in Petitioner's case) such as an inability to care for his wife following her brain surgery. *Id.* at 7. Respondent insists that "[o]verall, [P]etitioner's course was less severe than those in previous cases where damages were decided by the Court" such as *Dillenbeck, Johnson,* and *Fedewa.*[10] Opp. at 7-8.

One month after the parties' initial briefs, Respondent filed a reply, acknowledging that the updated medical records provided by Petitioner "support a finding that this case

---

[8] *McCray v. Sec'y of Health & Hum. Servs.,* No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021); *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018); *Fedewa v. Sec'y of Health & Hum. Servs.,* No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020).

[9] *Castellanos v. Sec'y of Health & Hum. Servs.,* No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. Mar. 30, 2022); *Schenck v. Sec'y of Health & Hum. Servs.,* No. 21-1768V, 2023 WL 2534594 (Fed. Cl. Spec. Mstr. Mar. 16, 2023).

[10] *Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in relevant part* 147 Fed. Cl. 131 (2020) (awarding $170,000.00 for past pain and suffering) *Johnson*, 2018 WL 5024012; *Fedewa,* 2020 WL 1915138.

warrants a slightly higher award than the $148,000 previously advanced for in [R]espondent's brief on damages." Respondent's Responsive Brief on Damages at 1, ECF No. 28. Noting several relevant entries (*id.* at 2-3), Respondent "acknowledges that . . . [P]etitioner experienced a moderately severe course of GBS . . . for at least two years" (*id.* at 5). He still insists, however, that the appropriate pain and suffering award should be lower than the $185,000.00 Petitioner seeks. *Id.* at 7.

In his reply filed one week later, Petitioner insists that the comparable cases proposed by Respondent are not analogous because those petitioners suffered milder GBS illnesses. Petitioner's Reply to Opp. at 2-4. He contends that the significant difference in the amount awarded in *Castellanos* and that proposed by Respondent shows "*Castellanos* is particularly inapposite." *Id.* at 2. He again argues that his hospitalization, rehabilitation, and treatment were more extensive than for the *Johnson* and *Fedewa* petitioners, as well as the petitioner in the *Dillenbeck* case cited by Respondent. *Id.* at 4-6.

### IV.    Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical treatment evidence, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner - age 76 and physically active when vaccinated - suffered a moderate case of GBS, involving common symptoms such as weakness, leg pain, tingling and numbness in the upper and lower extremities as well as a cold feeling in his hands, and gait and balance issues. During hospitalizations and inpatient rehabilitation lasting more than one month, Petitioner obtained slow improvement but also suffered a slight worsening of symptoms – developing abdomen pain and bowel issues, some increased difficulty ambulating, and minor problems breathing. Although he required significant PT after returning home (more than 100 sessions at home and in clinic), he was able to bike ride and hike less than a year after symptom onset. But the record reflects well-documented residual effects of Petitioner's GBS illness for at least two years.

Petitioner first sought treatment on October 11, 2023, from his primary care provider ("PCP"), and then at a later emergency room ("ER") visit, complaining of weakness and fatigue, coldness in his hands, and tingling in the hands and feet. Ex. 5 at 19-20 (PCP visit); Ex. 2 at 35-39 (ER visit). His symptoms advanced quickly, and he was forced to use a walker by his return to the ER the next day (on October 12th). Ex. 2 at 40. However, Petitioner was immediately diagnosed with GBS (which testing confirmed) and admitted to the hospital. *Id.* at 40-59. Although he, no doubt, had grave concerns during this time, his failure to obtain a proper diagnosis on October 11th, does not rise to the level of the difficulties experienced by the *Fedewa* petitioner – including a fall and inability to get up in his front yard between ER visits and significant complications when undergoing a second lumbar puncture and EMG testing. *See Fedewa,* 2020 WL 1915138, at 3.

Despite his rapid diagnosis before his symptoms became severe, Petitioner also developed abdominal pain and bowel issues, and obtained only slow improvement with treatment while hospitalized.[11] After seven days, he was transferred to an inpatient rehabilitation facility but was forced to return to a different hospital two days later due to increased leg pain and a concern regarding his breathing.[12] Reporting that he felt weaker than previously, Petitioner spent an additional ten days in this hospital (without requiring respiratory support) and 25 days thereafter in another inpatient rehabilitation.[13]

---

[11] Petitioner began a five-day course of IVIG treatment on October 12, 2023. Ex. 2 at 56. Although he presented with significant weakness, on October 13, 2023, it was noted that he was able to dress and go to the bathroom independently. *Id.* at 60. After Petitioner developed "some abdominal pain" (*id.* at 69) following his third day of IVIG therapy, his family expressed a desire for tertiary care but were reassured he was receiving all available treatment. *Id.* at 69-70. It was noted that "the patient does not have any shortness of breath . . . and his weakness remains stable and slowly improving. He predominately complains of his abdominal pain we will do further work-up but may also be due to his constipation." *Id.* at 70. Despite taking Gabapentin, Petitioner's pain was noted to be poorly controlled, and he reported new abdominal pain on October 14, 2023. *Id.* at 78-79. On October 15, 2023, it was noted that Petitioner "ha[d] been slowly improving though easily [got] fatigued and tired with pain in his lower extremities with numbness or paresthesias." *Id.* at 84. After his fifth and final day of IVIG therapy, Petitioner continued to experience weakness and was started on IV steroids. *Id.* at 104. By October 17th, Petitioner's abdominal pain and constipation was noted to be improving. *Id.* at 120.

[12] Petitioner was switched to oral steroids based on his family's preference and transferred to an inpatient rehabilitation on October 20, 2023. Ex. 12 at 19; Ex. 3 at 91. That evening he had difficulty sleeping due to an increase in his neuropathic leg pain. *Id.* He was transferred to a different hospital on October 21, 2023, after reporting "a 'constricting band' around his abdomen" and more labored breathing, especially with slight movements. Ex. 3 at 91; *accord.* Ex. 12 at 19.

[13] Petitioner's breathing was monitored during this second hospital stay, but it was determined that he did not require respiratory support. Ex. 3 at 95. He was able to feed himself but required a wheelchair and sling to transfer from the bed. *Id.* at 99. Upon his discharge from inpatient therapy, Petitioner was noted to require several months of PT but had inside mobility. Ex. 4 at 45. He was provided a sliding board to aid in transfers and shown how to operate his wheelchair when outdoors. *Id.* at 45-56.

After his discharge on November 25, 2023, Petitioner continued to experience abdominal issues, weakness, and fatigue, but made good (albeit slow) progress during PT through July 2024.[14] A physically active retired physics teacher prior to his GBS illness, Petitioner reported some success cycling and hiking in August 2024.[15] However, he continued to require PT - attending an additional 40 sessions in clinic through December 2024. Ex. 16. By September 2024, Petitioner stated that "he went for a walk yesterday and it was the first time he felt like he was walking faster and almost normal." Ex. 16 at 171. At a neurology appointment in October 2025, Petitioner recounted "[n]ot having any pain per se [b]ut . . . continued pins and needles in the feet." Ex. 17 at 2. He also stated that he had finished PT, was continuing to perform exercises to help with balance and was going to PT for back pain. *Id.*

In addition to *Fedewa*, I do not find the *Schenck* or *Castellanos* cases helpful when determining the appropriate pain and suffering award in this case. The *Schenck* petitioner's award was based in large part upon specific personal circumstances not found here. *Schenck,* 2023 WL 2534594, at *3. And I was required to issue a ruling in *Castellanos* finding six-months sequela in which I also determined that the later symptoms alleged as vaccine-related were more likely due to unrelated co-morbidities. *Castellanos,* 2022 WL 1482497, at *7, 10. Thus, the *Castellanos* petitioner's GBS illness was clearly less severe. *Id.* at *9-10.

In contrast, the *McCray, Johnson,* and *Dillenbeck* cases offer some helpful guidance. However, the age of the *Johnson* determination – issued in 2018,[16] dilutes its probative value. And the *Dillenbeck* petitioner's inability to return to a job that she loved was a factor when determining her award. *Dillenbeck,* 2019 WL 4072069, at *14. Although Petitioner's enjoyment of activities such as biking and hiking could be similarly viewed, the record shows he was able to participate in these activities post-illness.

---

[14] A few days after his discharge, Petitioner visited his PCP for treatment of constipation, reporting improved motor function during rehabilitation, a continued need for Gabapentin to address his neuropathy pain, and receiving PT through home health. Ex. 5 at 24. He participated in 37 PT sessions through January 2024, and an additional 15 PT sessions from May through July 2024. Exs. 7, 9 (PT records). By early January 2024, he could navigate stairs but continued to exhibit fatigue and balance issues. Ex. 7 at 105. By late July 2024, Petitioner reported improvement in neuropathy pain as well, stating "sometimes it's background noise but other days it can still be very intense." Ex. 9 at 31.

[15] In an email communication with his neurologist on August 30, 2024, Petitioner reported that he "had been doing well in recovering, now doing some trail hiking, cycling (up to 60 mi[les] on occasion), seeing a great PT twice weekly emphasizing ankle and toe strength and balance, doing a 20 min[ute] core exercise routine, and strength training at a PT fitness center." Ex. 15 at 37. He added that "[a]s of 3 weeks ago [his] neuropathy had receded to [his] toes and [his] walking was becoming more natural." *Id.*

[16] Issued by former Chief Special Master Dorsey in August 2018, the *Johnson* decision was the first substantive damages decision issued in an SPU Flu/GBS case. *Johnson,* 2018 WL 5024012.

10

Besides *McCray*, I also find the *J.S., Ruppert,* and *Elenteny*[17] cases (reflecting past pain and suffering awards ranging from $178,000.00 to $180,000.00) to be particularly instructive. All involved moderate GBS symptoms, lengthy hospital and inpatient rehabilitation stays, and significant outpatient PT thereafter. The *Elenteny* petitioner had a longer duration of documented residual symptoms (2.75 years) and never returned to her baseline. *Elenteny*, 2023 WL 2447498, at *2. And the *Ruppert* petitioner was forced to contend with a significant co-morbidity (cancer) during her illness. *Ruppert*, 2023 WL 9063679, at *8. Although he only sought treatment for ten months, the *J.S.* petitioner had well-documented residual sequela. *J.S.*, 2024 WL 3326833, at *3, 7. Also an active retiree, he experienced symptoms that most closely mirrored Petitioner's and required 33 days of inpatient rehabilitation followed by almost 100 outpatient therapy sessions. *Id.* at *1-3, 6-7. Thus, the *J.S.* case offers the best comparison, and Petitioner should be awarded the same amount of compensation for his past pain and suffering.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $178,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.**[18]

**I therefore award Petitioner a lump sum payment of $178,000.00, representing compensation for his actual pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[19]

---

[17] *J.S. v. Sec'y of Health & Hum. Servs.,* No. 22-0879V, 2024 WL 3326833 (Fed. Cl. Spec. Mstr. Apr. 29, 2024) (awarding $178,000.00 for past pain and suffering); *Ruppert v. Sec'y of Health & Hum. Servs.,* No. 18-1621V, 2023 WL 9063679 (Fed. Cl. Spec. Mstr. Nov. 30, 2023) (awarding $180,000.00 for past pain and suffering); *Elenteny v. Sec'y of Health & Hum. Servs.,* No. 19-1972V, 2023 WL 2447498 (Fed. Cl. Spec. Mstr. Feb. 1, 2023) (awarding $180,000.00 for past pain and suffering)

[18] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
